IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| ALI LONDON, in his individual capacity and as next of friend for L.L., | Case No. 22-cv-00491-DKW-KJM |
|---|---|
| Plaintiffs, | **ORDER (1) GRANTING DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION TO DISMISS; (2) DENYING AS MOOT DEFENDANTS MICHAEL HEH, MARIA HEH, WENDY STAFFORD, NICOLE LINKE, AND TURTLE BAY CONDOS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND (3) DENYING AS MOOT DEFENDANTS ANDREW TYAU-BEAM AND BYRON BEATTY'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNT VIII** |
| vs. | |
| MICHAEL HEH, *et al.*, | |
| Defendants. | |

Plaintiff Ali London brings suit against the City and County of Honolulu (the "City"), Honolulu Police Department ("HPD") Officers Andrew Tyau-Beam and Byron Beatty (the "Officers"), and his former rental agents and landlords Michael Heh, Maria Heh, Wendy Stafford, Nicole Linke, and Turtle Bay Condos, LLC (collectively the "Rental Defendants"), claiming that Defendants committed various violations of the United States Constitution and state law while evicting him during the COVID-19 pandemic. On November 13, 2023, the Court dismissed, *inter alia*, London's federal claims, finding that London had conceded the City and Officers'

arguments as to qualified immunity and *Monell* ratification, and failed to adequately plead his *Monell* failure to train claim.  In doing so, the Court also held in abeyance the Rental Defendants' motion for partial summary judgment and the Officers' motion for judgment on the pleadings as to Count VIII, pending determination of whether London could amend his Complaint to assert a cognizable federal claim. The Court granted London leave to amend only his *Monell* failure to train claim, and he filed a First Amended Complaint ("FAC") on November 25, 2023.

The City now moves to dismiss the FAC, arguing that it again fails to address the deficiencies previously identified by the Court.  Having reviewed the FAC, the motions briefing, and the record generally, the Court agrees.  Specifically, although London attempts to add new factual detail to support his *Monell* failure to train claim, he still fails to: (1) identify an inadequate training program; (2) show that the City was deliberately indifferent to the need for different or additional training; or (3) establish that the lack of such training actually deprived him of any constitutional rights.  Accordingly, as more fully discussed below, the City's motion to dismiss is GRANTED.  Moreover, as the *Monell* failure to train claim was the only federal claim remaining in this case premised on federal question jurisdiction under 28 U.S.C. § 1331, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.  The Rental Defendants' motion for summary judgment

- 2 -

and the Officers' motion for judgment on the pleadings are therefore both DENIED

AS MOOT.

## FACTUAL & PROCEDURAL BACKGROUND[1]

### I.    Factual Background

Plaintiff Ali London, individually and as next friend for his minor daughter

L.L., alleges the following facts in his FAC:

London is of "British East African" descent and has custody of L.L., who is

of "British East African" and Native Hawaiian descent.  FAC at ¶¶ 1–2, Dkt. No.

80.  In mid-2020, London entered into a series of three written rental agreements

with Maria and Michael Heh to rent their Oʻahu apartment from August 7, 2020 to

November 1, 2020.  *Id.* at ¶¶ 25–27.  During the course of London's occupancy,

however, the Hehs and their rental agents, Wendy Stafford and Nicole Linke,

began acting in an increasingly hostile manner, including by demanding he pay

higher rent, aggressively approaching him, throwing hard objects in his direction,

sending him threatening text messages, disconnecting his electricity, cable

television, and Internet services, and locking the apartment's front door.  *Id.* at

¶¶ 28–32, 58–59.

---

[1]This Order sets forth a condensed version of the factual and procedural background of this case
as relevant to the instant motion to dismiss.  A more detailed version is set forth in the Court's
prior Order, Dkt. No. 79, and will not be repeated here.

On November 1, 2020, things escalated when Stafford came to the apartment and attempted to forcibly evict London and his daughter.  *Id.* at ¶ 33.  London called the police, who informed Stafford that they lacked jurisdiction over evictions and, in any case, could not evict London due to the operative eviction moratorium contained in the State of Hawaiʻiʻs COVID-19 Emergency Proclamation.  *Id.* at ¶¶ 34–35.  During this interaction, Stafford falsely represented to the police that London was using a false identity and had previously engaged in a physical altercation with a neighbor.  *Id.* at ¶ 36.

Thereafter, on November 22, 2020, the Hehs, Stafford, and Linke again attempted to evict London and his daughter by falsely claiming that London had only entered into a short-term rental agreement, and that the Hehs intended on occupying the apartment.  *Id.* at ¶¶ 37–38.  The Hehs, Stafford, and Linke forcibly entered the apartment while yelling at London to "get out" and taking photos and videos of the apartment's interior.  *Id.* at ¶¶ 39–40.  London called the police, and HPD Officers Tyau-Beam and Beatty quickly responded.  *Id.* at ¶¶ 41–43.  At the time, London was unaware that Officer Tyau-Beam was personal friends with Stafford.  *Id.* at ¶ 46.

Upon their arrival, Officers Tyau-Beam and Beatty spoke first with the Hehs, Stafford, and Linke who provided them with unspecified false information about London.  *Id.* at ¶¶ 44–45, 53.  The Officers then spoke to London.  *Id.* at

¶¶ 44–45, 47.  Although London informed the Officers that he wished to file a police report, the Officers refused to take one, instead telling London that he needed to vacate the apartment as it was "his house"—that is, that it belonged to Michael Heh.  *Id.* at ¶¶ 48–50.  Based on the false information provided earlier, the Officers threatened to arrest London and remove L.L. from his custody should he refuse to vacate.  *Id.* at ¶¶ 51–53.  The Hehs, Stafford, and Linke recorded this interaction on their cellphones.  *Id.* at ¶ 54.  Thereafter, London and his daughter vacated the apartment, injuring London's back in the process.  *Id.* at ¶¶ 55–56.

## II.  Procedural Background

On September 28, 2021, London filed a grievance with the Honolulu Police Commission regarding the Officers' actions on November 22, 2020.  *Id.* at ¶ 60.  The grievance was transferred to the Professional Standards Office which found, after investigation, that neither Officer Tyau-Beam nor Officer Beatty had engaged in any wrongdoing.  *Id.* at ¶ 60–61.

On November 21, 2022, London initiated the instant action by filing his original Complaint against the Hehs, Stafford, Linke, Turtle Bay Condos LLC, HPD,[2] the City, and the Officers.  Dkt. No. 1.  Therein, London alleged the following causes of action: (1) wrongful eviction (Count I); (2) wrongful entry

---

[2]On August 8, 2023, the parties stipulated to dismiss with prejudice all claims against the Honolulu Police Department such that it is no longer a defendant in this case.  Dkt. No. 66.

(Count II); (3) breach of the covenant of quiet enjoyment/breach of the implied warranty of quiet enjoyment (Count III); (4) invasion of privacy (Count IV); (5) unfair and deceptive trade practices (Count V); (6) assault (Count VI); (7) defamation/defamation per se (Count VII); (8) violation of the Hawaiʻi Fair Housing Act, Haw. Rev. Stat. Chapter 515 (Count VIII); (9) civil conspiracy (Count IX); (10) negligent hiring, training, and/or supervision (Count X); (11) negligence, negligent investigation and enforcement (Count XI); (12) constitutional claims pursuant to 42 U.S.C. § 1983 for violations of the First Amendment right to petition the government for redress of grievances (Count XII, Claim 1) and the Fourteenth Amendment rights to equal protection (Count XII, Claim 2), procedural due process (Count XII, Claim 3), and substantive due process (Count XII, Claim 4), and pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978), for failure to train (Count XII, Claim 5) and ratification (Count XII, Claim 6); (13) intentional infliction of emotional distress (Count XIII); and (14) negligent infliction of emotional distress (Count XIV).

On July 26, 2023, the City and the Officers each filed a motion for judgment on the pleadings. Dkt. Nos. 61 & 62. The next day, the Rental Defendants filed a motion for partial summary judgment on Counts I, II, and II. Dkt. No. 63. On November 13, 2023, the Court issued an order granting the City's motion for

judgment on the pleadings and granting in part the Officers' motion for judgment on the pleadings.  Dkt. No. 79.  Specifically, the Court dismissed Counts I, IX, X, XI, XII (Claims 1–6), XIII, and XIV and granted London leave to amend only Count XII (Claim 5): his claim for failure to train under *Monell*.  *See id.* at 19.  As that was the only potentially remaining federal claim, the Court further held the Officers' motion for judgment on the pleadings as to Count VIII and the Rental Defendants' motion for partial summary judgment in abeyance pending determination of whether there exists a cognizable federal claim in this case.  *Id.*

On November 25, 2023, London filed his First Amended Complaint, alleging precisely the same claims.[3]  Dkt. No. 80.  Subsequently, on December 8, 2023, the City filed a motion to dismiss, arguing that London still failed to adequately state his *Monell* claim for failure to train.  Dkt. No. 82.  London filed his brief in opposition on January 19, 2024, Dkt. No. 88, and the City replied on January 26, 2024, Dkt. No. 93.  Pursuant to Local Rule 7.1(c), the Court elected to decide this matter without a hearing.  Dkt. No. 95.  This Order now follows.

---

[3]Although the Court's November 13, 2023 Order dismissed Counts I, IX, X, XI, XII (Claims 1–4, 6), XIII, and XIV without leave to amend, London's FAC includes all claims raised in the original Complaint.  *See* Dkt. Nos. 79–80.  According to the City, London represented during the parties' Local Rule 7.8 conference that these claims were included only for their preservation.  *See* Dkt. No. 82-1 at 2 n.1.  Notably, however, London does not address his decision to reallege these claims, nor is their inclusion in the FAC necessary to preserve them for appeal.  *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc).  As such, to the extent that London seeks to reallege these counts, the Court declines to consider them.  They were, and remain, dismissed without leave to amend.

## <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is considered facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* As such, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor do factual allegations that only permit the Court to

infer "the mere possibility of misconduct." *Id.* at 678–79 (citing *Twombly*, 550

U.S. at 555).

## DISCUSSION

### I.   Motion to Dismiss

London's sole remaining claim against the City is a claim for failure to train

pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658

(1978).  Under *Monell*, a local government may be held liable, *inter alia*, for

constitutional violations under 42 U.S.C. § 1983 if it:

> Fail[s] to train employees in a manner that amounts to deliberate
> indifference to a constitutional right, such that the need for more or
> different training is so obvious, and the inadequacy so likely to result
> in the violation of constitutional rights, that the policymakers of the city
> can reasonably be said to have been deliberately indifferent to the need.

*Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018) (quotation

marks and citation omitted).  "A municipality's culpability for a deprivation of

rights is at its most tenuous where a claim turns on a failure to train." *Connick v.

Thompson*, 563 U.S. 51, 61 (2011).

To establish municipal liability under this theory, the plaintiff must show:

"(1) an inadequate training program, (2) deliberate indifference on the part of the

[municipality] in adequately training its law enforcement officers, and (3) [that] the

inadequate training 'actually caused' a deprivation of [the plaintiff's] constitutional

rights." *Merritt v. Cnty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989); *see*

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  The Court addresses each

prong in turn.

     **a.**    <u>**Inadequate Training Program**</u>

     To determine whether an existing training program is inadequate, the Court

must consider it "in relation to the tasks the particular officers must perform."

*Canton*, 489 U.S. at 390.  In particular, a training program must "enable officers to

respond properly to the usual and recurring situations with which they must deal."

*Id.* at 391.  "Allegations of inadequate training are insufficient where they do not

identify what the training practices were, how the training practices were deficient,

or how the training caused the specific Plaintiff's harm."  *Hyer v. City & Cnty. of*

*Honolulu*, 2020 WL 3440934, at *8 (D. Haw. June 23, 2020).

     Here, London asserts that the City's existing training policies were

inadequate as, at the time of the alleged eviction, the City did not provide law

enforcement officers with implicit racial bias training.  *See* FAC at ¶ 18, 139, 143.

Specifically, London describes implicit bias training as "consist[ing] of seminar

and other hands-on training to prevent law enforcement officers from making snap

judgments based on unconscious racial stereotypes."  *Id.* at ¶ 16.  He then cites to a

Hawaiʻi Public Radio article, a Civil Beat article, and an American Civil Liberties

Union open letter which claim that analysis of HPD's own data shows that it

disproportionately enforced the COVID-19 emergency orders and engaged in use

of force incidents against Black/African-American persons.[4]  *Id.* at ¶¶ 19–21.

London also references a City Auditor report from December 2020 which noted

that "[s]imulation training can be effective to cover important police issues such as

. . . <u>implicitly racial</u> and use-of-force encounters."  *Id.* at ¶ 22.  Finally, London

adds that "given that the allegation in this case is that Defendant County had no

implicit racial bias training or that such training was 'non-existent,' more specific

detailed allegations about how training was inadequate is not required."  Dkt. No.

88 at 5.

     Contrary to London's assertions, merely stating that the City lacked a

specific type of training is not sufficient to show that the existing training program

was inadequate.[5]  Notably, other than generically alleging that HPD's lack of

implicit bias training contributed to the disparate enforcement of the COVID-19

emergency orders and use of force, London fails to explain how such training is

---

[4]Insofar as the City contends such articles are inadmissible hearsay, *see* Dkt. No. 82-1 at 12–14, the Court notes that "to the extent they were incorporated by reference in the complaint, the [articles] are not evidence, but allegations." *Gerritsen v. Warner Bros. Ent. Inc.*, 116 F. Supp. 3d 1104, 1119 (C.D. Cal. 2015); *see also* Dkt. No. 93 at 7 (acknowledging in the City's reply brief that "this Court need not reach the issue of whether the articles are hearsay.").

[5]London cites only to the out-of-circuit *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 625 n.5 (5th Cir. 2018) for the proposition that a complete lack of training is necessarily inadequate. Dkt. No. 88 at 3–5.  In addition to being non-binding, however, this case is inapposite as London alleges only that the City lacked *implicit racial bias* training—not that it lacked any training whatsoever with regard to the constitutional violations alleged.  *See* FAC at ¶¶ 18, 143; Dkt. No. 88 at 7.  Indeed, at least one of the articles London cites indicates the opposite.  *See* FAC at ¶ 19 (quoting former HPD Chief of Police Susan Ballard stating "'If [implicit bias training]'s something that will help the officer and it's something that we'll *expand* on our bias based training, it can only help, right?'" (emphasis added)).

necessary to enable HPD officers to complete their required tasks and respond properly to usual and recurring situations, or how such a deficiency directly caused his alleged harm.[6]  As such, London fails to show that even a complete failure to utilize implicit bias training rendered HPD's existing training program inadequate.

### b.   Deliberate Indifference

Even if London had sufficiently alleged that the lack of implicit bias training rendered HPD's training program inadequate, the Court must also consider whether such deficiency constituted "deliberate indifference" on the part of the municipality to the plaintiff's constitutional rights.  *Canton*, 489 U.S. at 388–89.  "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997) (quotation marks omitted).  As such, the plaintiff must point to a "particular omission in their training program [that] would cause municipal employees to violate citizens' constitutional rights," or "specific shortcomings in the training . . . or facts that might place the City on notice that constitutional deprivations were likely to occur."  *Hyun Ju Park v. City & Cnty. of Honolulu*, 292 F. Supp. 3d 1080, 1099 (D. Haw. 2018) (quotation marks, brackets, and citations omitted).  Generally, this

---

[6]Indeed, London's reference to use-of-force statistics is both puzzling and irrelevant given that he does not allege that either Officer Tyau-Beam or Officer Beatty engaged in the use of force.

is done by alleging a "pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62.  In a "narrow range of circumstances," however, the plaintiff may demonstrate deliberate indifference where the constitutional violation was "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 409.

Here, London asserts that the City was "on notice that its racial bias training for law enforcement officers was non-existent or inadequate, based on HPD's own data regarding selective enforcement of laws, arrests, and use of force against African-Americans, who suffered disproportionately at the hands of HPD officers, [in the] years prior to November of 2020."  FAC at ¶ 143.  Also, London claims that the City was deliberately indifferent to the consequent risk of constitutional violations given former HPD Chief of Police Susan Ballard's statements that implicit racial bias training:

> may be more of [a] Mainland issue than a local one . . . despite the fact that most states in the United States adopted implicit racial bias training since the Ferguson riots in 2014, HPD's own data regarding selective enforcement of the laws, arrests, and use of force against African-Americans who suffered disproportionately at the hands of HPD

officers, as well as, the results and recommendations of the City Auditor's 2020 report to the Mayor and the City Council.

*Id.* at ¶¶ 19, 144.

Such allegations, however, are plainly insufficient to establish deliberate indifference—either through the traditional method or through the single incident theory.  As an initial matter, London fails to specifically identify a *single prior incident* in which HPD officers committed a constitutional violation similar to those alleged in the instant case.  Rather, London relies on generalized assertions that HPD's data indicates that Black/African-American persons were more likely to be subjected to the use of force or arrested pursuant to the enforcement of the COVID-19 emergency orders.[7]  *See* FAC at ¶¶ 19–21.  It is impossible, however, to determine from these statistics alone whether any of the prior arrests or uses of force involved discriminatory intent or constitutional violations of any kind.  Nor is it evident that any of the underlying incidents similarly involved an eviction, allegations of trespass, or even failure to *enforce* the COVID-19 emergency orders.

---

[7] It is of course curious that London never provides the actual data from which he draws these conclusions.  Instead, he merely cites to news articles which purport to have done their own analysis from, *inter alia*, "hundreds of pages of Honolulu Police Department logs."  Ashley Mizuno, *Racial Disparities Emergence in HPD Enforcement of Stay-at-Home Violations*, HAWAIʻI PUBLIC RADIO (June 29, 2020), https://www.hawaiipublicradio.org/local-news/2020-06-29/racial-disparities-emerge-in-hpd-enforcement-of-stay-at-home-violations; Mateo Caballero, *Racial and Wealth Disparities in Policing*, ACLU OF HAWAIʻI (July 5, 2020), https://www.acluhi.org/sites/default/files/field_documents/06.05.20_-_aclu_letter_to_hpd_re_discriminatory_policing.pdf; Anita Hofschneider, *HPD Chief Says There's Less Racial Bias in Hawaii.  She's Wrong.*, CIVIL BEAT (June 29, 2020), https://www.civilbeat.org/2020/06/what-implicit-bias-looks-like-in-hawaii/; FAC at ¶¶ 19–21.

*See* FAC at ¶ 20 (claiming only that "HPD's own arrest data shows that during the COVID-19 pandemic, HPD was . . . five times more likely to arrest a Black or Samoan person for *violations of the COVID-19 orders* than to arrest a white person." (emphasis added)).  As such, these statistics do not speak to—much less plausibly allege—a pattern of constitutional misconduct which would support a finding of deliberate indifference on the part of the City.[8]

Moreover, even under the narrow single incident theory, London fails to demonstrate that the instant incident qualifies as the exceptional situation in which the alleged "violation of federal rights [was a] highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 409.  London claims that the violation of his constitutional rights was "certainly foreseeable" as a result of the City's "deliberate choice" to reject implicit racial bias training based on the assumption that racial discrimination "may be more of [a] Mainland issue than a local one."  Dkt. No. 88 at 7; FAC at ¶¶ 19, 144.  Notably, however, London never explains *why* he believes such violations were "certainly foreseeable."  Rather, he

---

[8]To the extent that London relies upon the City Auditor report recommending that HPD implement simulation-based racial bias training to further argue that the City was deliberately indifferent, it is notable that the report was only issued in December 2020—a month *after* London's alleged eviction.  *See* FAC at ¶¶ 22, 56.  Moreover, as other courts have acknowledged, a "report recommending improvements to an existing training program—in other words, an acknowledgement that the existing training program is something less than perfect— does not, without more, give rise to a plausible inference of deliberate indifference on the part of the City."  *Boddie v. City of New York*, 2016 WL 1466555, at *5 (S.D.N.Y. Apr. 13, 2016).

asserts only that the "main purpose of this type of training is to prevent violation of constitutional rights based on one's race or ethnic background" and that the "officers' actions were motivated by racial prejudice and/or bias, which could have been prevented by implicity [sic] racial training by the Defendant County." Dkt. No. 88 at 7; FAC at ¶ 141. Such conclusory allegations are insufficient to show that recurring constitutional violations would be the "obvious consequence" of failing to provide law enforcement officers with implicit bias training. *See Connick*, 563 U.S. at 66; *see also Canton*, 489 U.S. at 391 (noting that *Monell* liability requires something other than showing "that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct."). Accordingly, London has also failed to establish deliberate indifference under the single incident theory.[9]

### c.   <u>Actual Causation</u>

Finally, even if London had properly alleged both inadequate training and deliberate indifference, the Court must further consider whether the purported deficiency actually caused the alleged constitutional deprivation. *Canton*, 489 U.S.

---

[9]Indeed, other courts have found similarly. *See, e.g.*, *Fakhri v. Louisville-Jefferson Cnty. Metro. Gov't*, 2019 WL 4196056, at *5 (W.D. Ky. Sept. 4, 2019) ("no court has held that absence of implicit bias training fits within the narrow range of instances representing a failure to equip law enforcement officers with specific tools such that a federal rights violation is the highly predictable outcome."); *Brown v. Cnty. of San Bernardino*, 2021 WL 99722, at *6 (C.D. Cal. Jan. 8, 2021) (dismissing a *Monell* failure to train claim based on implicit bias where plaintiff failed to allege additional similar incidents.").

at 391.  To constitute actual causation, "the identified deficiency in a local

governmental entity's training program must be *closely related* to the ultimate

injury."  *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (brackets,

quotation marks, and citation omitted).  Essentially, a "plaintiff must show that his

or her constitutional injury would have been avoided had the governmental entity

properly trained its employees."  *Id.* (quotation marks and citation omitted).

> Here, London asserts only that:

> 141. Had Plaintiffs not been black or African-American, Defendant Officer Tyau-Beam and Defendant Officer Beatty would not have ordered Plaintiffs to vacate Plaintiff's Residence, threatened to arrest Plaintiff, or threatened to remove L.L. from her father's custody, and said officers' actions were motivated by racial prejudice and/or bias, which could have been prevented by implicity [sic] racial training by the Defendant County.
> . . .

> 146. Causation between Defendant County's failure to provide implicit racia [sic] bias training and the foreseeable deprivation of Plaintiff's constitutional rights is also supported by the data showing that African-Americans or blacks suffered disproportionately from HPD's selective enforcement, arrest, and use of force against African-American[s] during the COVID-19 Lockdown and the results and recommendations of the City Auditor's 2020 report to the Mayor and the City Council.

FAC at ¶¶ 141, 146.

> Such conclusory statements are not sufficient to establish the close causal

relationship required to plausibly allege a failure to train claim under *Monell*.

Indeed, beyond pure speculation, London provides *no* specific factual allegations to support that the Officers' actions were predicated upon his race.[10]

In sum, London has failed to show: (1) that the City's lack of implicit bias training rendered its existing training program inadequate; (2) that the City was deliberately indifferent to this deficiency; or (3) that the deficiency actually caused any constitutional violation.  London's failure to satisfy any of the failure to train requirements demonstrates precisely why such *Monell*-based claims are the most tenuous.  *Connick*, 562 U.S. at 61.  As such, the City's motion to dismiss, Dkt. No. 82, is GRANTED, and London's claim for failure to train under *Monell* is DISMISSED.[11]  Further, because London was previously provided an opportunity

---

[10]To the extent that London asserts that he is entitled to plausibility discovery to establish such causation, *Twombly* and *Iqbal* provide for nothing of the sort—particularly given that London was present during the alleged events.  *See* Dkt. No. 88 at 8 ("Plaintiff should be afforded an opportunity to conduct discovery and this issue should be reserved for a motion for summary judgment."); *but see Iqbal*, 556 U.S. at 678–79 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *Mujica v. AirScan Inc.*, 771 F.3d 580, 593 n.7 (9th Cir. 2014) (The "suggest[ion] that courts retain discretion to permit discovery whenever a plaintiff has failed to satisfy Rule 8's plausibility standard . . . is simply incompatible with *Iqbal* and *Twombly*.").

[11]Because the Court finds that London failed to sufficiently allege the elements of a failure to claim train under *Monell*, it need not (and does not) reach the question of whether the underlying constitutional violations were sufficiently pled.

to correct the deficiencies with this claim and has failed to do so, dismissal is with prejudice.

## II.   <u>Supplemental Jurisdiction</u>

Having dismissed the sole remaining federal claim in this case premised on federal question jurisdiction under 28 U.S.C. § 1331, the Court now turns to whether to exercise supplemental jurisdiction over the balance of the state law claims.  *See* FAC at ¶ 13; 28 U.S.C. § 1367(c)(3).

Pursuant to 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction over state law claims if it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  In undertaking this evaluation, the Court "should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  Although the Court's decision is discretionary, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Id.* at 350 n.7.

That is precisely the situation here.  Although this case is still in its infancy, all federal claims have now been dismissed.  Moreover, avoiding "[n]eedless decisions of state law" would promote "comity and . . . justice between the parties,

by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726.  Accordingly, as neither judicial economy, convenience, fairness, nor comity weigh in favor of continued jurisdiction, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.  Those claims are therefore DISMISSED WITHOUT PREJUDICE.

## CONCLUSION

For the reasons set forth herein, Defendant City and County of Honolulu's motion to dismiss, Dkt. No. 82, is GRANTED and Count XII (Claim 5) is DISMISSED WITH PREJUDICE.  The Court further declines to exercise supplemental jurisdiction over the remaining state law claims, which are DISMISSED WITHOUT PREJUDICE.  The Officers' motion for judgment on the pleadings as to Count VIII, Dkt. No. 62, and the Rental Defendants' motion for partial summary judgment, Dkt. No. 63, are accordingly DENIED AS MOOT.

IT IS SO ORDERED.

DATED: March 27, 2024 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

---

*Ali London vs. Michael Heh, et al;* Civ No. 22-00491 DKW-KJM;
**ORDER (1) GRANTING DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION TO DISMISS; (2) DENYING AS MOOT DEFENDANTS MICHAEL HEH, MARIA HEH, WENDY STAFFORD, NICOLE LINKE, AND TURTLE BAY CONDOS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND (3) DENYING AS MOOT DEFENDANTS ANDREW TYAU-BEAM AND BYRON BEATTY'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNT VIII**